AUSAs: Benjamin Gianforti/Jennifer N. Ong

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

23MAG 7680

UNITED STATES OF AMERICA

v.

DONALD DILLION,

Defendant.

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 1343, 1349, & 1956(h)

COUNTY OF OFFENSE:
Bronx

SOUTHERN DISTRICT OF NEW YORK, ss.:

Kerry Conroy, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

1.  At least in or about 2021, in the Southern District of New York and elsewhere, DONALD DILLION, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2.  It was a part and an object of the conspiracy that DONALD DILLION, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, DILLION agreed with others to engage in a scheme to defraud victims ("Victims") by convincing them that they had won prizes in a sweepstakes sponsored by a well-known marketing and sweepstakes company (the "Sweepstakes Company"), deceiving Victims into paying money represented to be taxes and fees necessary to claim the prizes, and directing Victims to send wires and payments by other methods to the Southern District of New York and elsewhere in furtherance of that scheme (the "Sweepstakes Scheme").

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

3.      At least in or about 2021, in the Southern District of New York and elsewhere, DONALD DILLION, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, DILLION engaged in a scheme to defraud Victims by convincing them that they had won prizes in a sweepstakes sponsored by the Sweepstakes Company, deceiving Victims into paying money represented to be taxes and fees necessary to claim the prizes, and directing Victims to send wires and payments by other methods to the Southern District of New York and elsewhere in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 & 2.)

## COUNT THREE
### (Conspiracy to Commit Money Laundering)

4.      At least in or about 2021, in the Southern District of New York and elsewhere, DONALD DILLION, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

5.      It was a part and an object of the conspiracy that DONALD DILLION, the defendant, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds were the proceeds of some form of unlawful activity, and knowing that the international transportation, transmission, and transfer was designed to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, to wit, DILLION agreed with others to conceal the nature, location, source, ownership, and control of the funds received from Victims in connection with the Sweepstakes Scheme by sending their money in part to a bank account in China with no apparent connection to the Sweepstakes Company.

(Title 18, United States Code, Section 1956(h).)

The bases for my knowledge and the foregoing charges are, in part, as follows:

2

6.  I am a Special Agent with the FBI, assigned to a money laundering squad based in New York City. I have received training and have participated in investigations of financial crimes and money laundering operations. I have been involved personally in the investigation of this matter. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## The Scheme to Defraud Victim-1

7.  On or about April 29, 2022, I and another member of law enforcement interviewed an individual ("Victim-1"). During that interview, I learned the following:

   a.  In or about June 2021, Victim-1 received a voicemail message from a female who identified herself as "Danielle Lyons." Lyons claimed, in substance and in part, that she was calling from the Sweepstakes Company and that Victim-1 had won a cash prize of approximately $2.6 million and a Mercedes Benz. Lyons also left Victim-1 a callback number. Victim-1 had entered the Sweepstakes Company's sweepstakes for at least two years before receiving the call from Lyons, so was not surprised by the call.

   b.  When Victim-1 called the number that Lyons left the voicemail message, Victim-1 spoke to a male who identified himself as "Mike Anderson" and who told Victim-1 to call another number. When Victim-1 called the second number, he spoke to a male who identified himself as "Paul McClain," who told Victim-1 to call back later and ask for "Todd Sloane."

   c.  Within several days of Victim-1's call with McClain, Sloane called Victim-1 and instructed Victim-1 to open a bank account at a particular federal credit union (the "FCU") where Victim-1 already had an account so that Victim-1 could deposit the taxes he would owe on the prize from the Sweepstakes Company. Sloane also told Victim-1 that Victim-1 would have to deposit $400 as a processing fee, which Victim-1 refused to do without documentary evidence of the legitimacy of the prize Victim-1 had purportedly won.

   d.  Approximately a day later, Victim-1 received a message telling him to pick up his prize paperwork at a FedEx location. After reviewing the paperwork, Victim-1 was satisfied that the prize was legitimate. Approximately a day later, Victim-1 spoke to Sloane again. Sloane told Victim-1, in substance and in part, that Victim-1 owed approximately $38,500 in taxes and insurance fees on the prize money and the Mercedes Benz. Sloane provided Victim-1 with instructions to wire the funds owed to a bank account in the name of DD Metro Solutions LLC ("DD Metro") at a national bank ("Bank-1") ("DD Metro Account-1").

3

e. On or about June 9, 2021, Victim-1 wired approximately $38,500 from Victim-1's FCU account to DD Metro Account-1.

f. Victim-1 never received the cash prize or a Mercedes Benz from the Sweepstakes Company.

8. Based on my review of publicly available corporate information published by the State of Wyoming, I know that DD Metro is a Wyoming corporation that shares the same initials as DONALD DILLION, the defendant, and that lists DILLION as its organizer and president.

9. Based on my review of records provided by Bank-1, I know that the sole signatory for DD Metro Account-1 is DONALD DILLION, the defendant, and that DD Metro Account-1 is linked to an address in the Bronx that, based on my review of a law enforcement database, I know is linked to DILLION. Based on my review of records from another national bank ("Bank-2") that holds an account for DD Metro ("DD Metro Account-2"), I know that the sole signatory for DD Metro-Account-2 is DILLION and that DD Metro Account-2 is linked to the same address in the Bronx as DD Metro Account-1.

### The Scheme to Defraud Victim-2

10. On or about December 19, 2022 and June 12, 2023, I and another member of law enforcement interviewed another individual ("Victim-2") who resides in North Carolina. During that interview, I learned the following:

a. In or about June 2021, Victim-2 received several voicemails claiming, in substance and in part, that Victim-2 had won the Sweepstakes Company's sweepstakes and was entitled to a $3.5 million cash prize and a Mercedes Benz. Victim-2 had entered the Sweepstakes Company's sweepstakes previously so was not surprised by the calls.

b. Victim-2 called back the number that left the voicemail and spoke to at least two individuals, including an individual who identified himself as "Donald Dillion" (hereinafter, "Dillon"). These two individuals, including Dillion, told Victim-2, in substance and in part, that Victim-2 had won a cash prize and a car from the Sweepstakes Company, and that she needed to pay storage and insurance fees to claim her prizes.

c. Thereafter, Victim-2 paid these purported fees to get the prizes released principally by making out several checks to DD Metro and then, based on my review of a local police report, sending those checks by mail to, among other places, Queens, New York and Jacksonville, Florida. Dillion instructed Victim-2 to tell Victim-2's bank that the checks were for the purchase of materials for a home furnishing project, but Victim-2 declined to do so.

4

    d. At a certain point, Victim-2 received a briefcase and was told by purported representatives of the Sweepstakes Company that the briefcase contained cash but was rigged with a dye pack that would explode if the briefcase was opened. Victim-2 eventually opened the briefcase and found it was full of crossword puzzle books and no cash. At another point, Victim-2 received a Mercedes Benz key. At yet another point, Victim-2 received a photograph of the Mercedes Benz she had purportedly won and a photograph of a purported Sweepstakes Company check made out in her name.

    e. Victim-2 never received the cash prize or a Mercedes Benz from the Sweepstakes Company.

  11. Based on my review of records from DD Metro Account-2, I know that Victim-2 issued an approximately $14,000 check to DD Metro on or about June 23, 2021 and approximately four $9,000 checks and a single $2,000 check made out to DD Metro on or about June 29, 2021. All of these checks were deposited in DD Metro Account-2 and endorsed by DONALD DILLION, the defendant.

### The Scheme to Defraud Victim-3

  12. On or about February 1, 2023, I interviewed a third victim ("Victim-3"), who resides in West Virginia. I have also reviewed a report of an interview of Victim-3 conducted by another member of law enforcement in or about August 2021. Based on my own interview and my review of the other law enforcement officer's interview report of Victim-3, I have learned the following:

    a. Victim-3 recalled entering the Sweepstakes Company's sweepstakes at some point in or about early 2021. In or about February 2021, Victim-3 received a call from a male who identified himself by the last name "Freeman." Freeman told Victim-3, in substance and in part, that Victim-3 had purportedly won the Sweepstakes Company's sweepstakes, which included, among other things, a $2.7 million cash prize, a Mercedes Benz, and a weekly payment of $5,000. In order to claim these prizes, Freeman told Victim-3 that Victim-3 had to pay taxes on the cash value of the prizes.

    b. After speaking regularly with Freeman over the course of approximately a month, Victim-3 began speaking with a male who identified himself as "Michael Henry." Henry told Victim-3, in substance and in part, that Freeman had been attempting to defraud Victim-3 and that in fact Victim-3 had won $5 million. To claim the larger prize, according to Henry, Victim-3 had to pay more in taxes.

    c. Victim-3 recalled wiring $20,000 to a company in New York called DD Metro and being instructed to label the wire as for the purchase of a car for a "Marcia Walters." Victim-3 recalled sending hundreds of thousands of dollars more in cashier's checks, postal

money orders, and gift cards to other individuals in New York and elsewhere in the United States.

        d.      Victim-3 never received the cash prize or the car from the Sweepstakes Company.

13.      Based on my review of records from DD Metro Account-1, I know that on or about February 18, 2021, Victim-3 wired approximately $15,500 to DD Metro Account-1, with a corresponding memorandum indicating that the money was "for the benefit of Marcia Walters Johnson for car purchase." The following day, on or about February 19, 2021, the same amount—that is, approximately $15,500—was wired from DD Metro Account-1 to an account at a Chinese bank held in the name of a "Cai Yunyun" (the "Yunyun Bank Account"). The wire was accompanied by a memorandum indicating that the money was for "GOODS POP GOODS CONT 8613302299705 [sic]."

14.      Based on my further review of records from DD Metro Account-1, I have identified a similar pattern of apparent fraud proceeds being sent to the Yunyun Bank Account shortly after the proceeds were deposited in DD Metro Account-1. For example,

        a.      On or about March 17, 2021, another victim of the Sweepstakes Scheme ("Victim-4"), whom, based on my review of law enforcement databases, I understand lived in Texas until he passed away in or about August 2022, wired approximately $48,200 to DD Metro Account-1. Based on my review of records from DD Metro Account-1, the account held approximately $176 when the approximately $48,200 was wired into the account. The same day, approximately $38,240 was wired from DD Metro Account-1 to the Yunyun Bank Account, with a corresponding memorandum indicating that the money was for "GOOD POP OPERATING EXPENSES CONT 8613302299705." There were no other transactions into or out of DD Metro Account-1 that day.

        b.      The next day, on or about March 18, 2021, Victim-4 wired approximately $31,000 to DD Metro Account-1. The same day, approximately $24,700 was wired from DD Metro Account-1 to the Yunyun Bank Account, with an identical memorandum to the one immediately above. Approximately $8,100 was also withdrawn from DD Metro Account-1 as cash on or about March 18, 2021.

WHEREFORE, deponent prays that DONALD DILLION, the defendant, be arrested, and imprisoned or bailed as the case may be.

_____
KERRY CONROY
Special Agent
Federal Bureau of Investigation

Sworn to me this 8th day of December 2023

_____
HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

7